**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| INSIGHT GLOBAL, LLC, | |
|---|---|
| Plaintiff, | CASE NO: _____ |
| -v- | Judge: |
| WESLEY WEITLAUF and BEACON HILL STAFFING GROUP, LLC | Magistrate Judge: |
| Defendants. | |

## INSIGHT GLOBAL, LLC'S COMPLAINT
## FOR INJUNCTIVE RELIEF, DAMAGES, AND OTHER RELIEF

Plaintiff, Insight Global, LLC ("Insight Global"), by and through the undersigned counsel, for its Complaint for Injunctive Relief, Damages and Other Relief against Defendants, Wesley Weitlauf ("Weitlauf") and Beacon Hill Staffing Group, LLC ("Beacon Hill"), states as follows:

### PRELIMINARY STATEMENT

1.      This action arises out of a coordinated scheme by Defendant Beacon Hill, a national staffing services company, to unlawfully acquire trade secret and confidential information from its direct competitor, Insight Global, through the unauthorized poaching of a former Insight Global employee, Weiflauf, in direct violation of Weitlauf's restrictive covenants with Insight Global.

2.      In the days prior to his separation of employment with Insight Global, Weitlauf, intentionally accessed and misappropriated numerous confidential documents and electronic files containing Insight Global's trade secrets for the purpose of using and disclosing those trade secrets to his new employer, Beacon Hill.

3.     While employed with Insight Global, Insight Global trusted Weitlauf with access to extensive confidential business information and trade secrets regarding Insight Global's business, services, customers and clients, pricing, strategies, and other confidential business and/or financial information.  Amongst other confidential information in the highly-competitive staffing industry, Weitlauf gained intimate knowledge of the Chicago market regarding the needs of Insight Global's clients and the availability of contractors to fill those needs, and the identity of Insight Global's key clients in the Chicago area, with a particular focus on revenue cycle teams in the healthcare industry.  Through his employment at Insight Global, Weitlauf was privy to Insight Global's market research, information regarding key contacts at Insight Global's current and prospective clients that influenced the decisionmakers, clients' staffing needs and business preferences, and benefitted from the goodwill generated from Insight Global's relationship and investment in its clients.

4.     Because of the importance and competitiveness of client relationships and other trade secrets and confidential information in the staffing industry, Insight Global takes meaningful steps to protect its valued information, including having employees like Weitlauf, as a condition of employment, execute employment agreements containing several restrictions on their use and/or disclosure of Insight Global's trade secret information, as well as conduct during and after employment with Insight Global.

5.     Weitlauf's employment with Insight Global ended on or about October 10, 2017. Almost immediately thereafter, and fully aware of the obligations contained in his employment agreement, Weitlauf began employment with Beacon Hill in its Chicago office in the same or similar position to the position he held at Insight Global.  Weitlauf's activities on behalf of Beacon Hill are in direct violation of multiple provisions of his employment agreement.

6.      Furthermore, upon information and belief, in the days prior to the end of his employment relationship with Insight Global, Weitlauf deliberately and knowingly misappropriated a number of documents and other information containing Insight Global trade secrets and is now using them to compete with Insight Global.  Such actions were both a breach of his employment agreement and a violation of federal and state trade secret laws.  Upon information and belief, Weitlauf continues to use Insight Global's misappropriated trade secrets to unlawfully compete with Insight Global on behalf of Beacon Hill, and will continue to do so and cause irreparable harm to Insight Global absent injunctive relief.

7.      Beacon Hill, with full knowledge of the fact that Weitlauf was subject to employment agreement with Insight Global that prohibit him from engaging in certain competing activities, hired Weitlauf to engage in those very activities and, upon information and belief, conspired with Weitlauf to hide such facts from Insight Global.  Beacon Hill's tortious activities are in furtherance of an ongoing raid that Beacon Hill has launched against Insight Global to steal Insight Global's employees, clients, and confidential business information, playing out in multiple venues across the United States, which were actively being litigated at the time Beacon Hill hired Weitlauf.

**PARTIES**

8.      Plaintiff Insight Global is a limited liability company organized under the laws of the State of Delaware.  Insight Global is a citizen of the states of Delaware and Georgia.  Plaintiff's sole member is IG Staffing Holdings, LLC ("IG"), whose sole member is IG Investments Holdings, LLC ("IGI"), whose sole member is Igloo Intermediate Holdings, Inc. ("IIH").  IG is a Delaware limited liability corporation whose headquarters and principal place of business are in Atlanta, Georgia.  IGI is a Delaware limited liability company whose headquarters and principal place of business are in Atlanta, Georgia. IIH is a Delaware

corporation with its principal place of business in Atlanta, Georgia. Insight Global's headquarters and principal place of business are in Atlanta, Georgia, located at 4170 Ashford Dunwoody Road, Suite 250, Atlanta, Georgia 30319. Insight Global also maintains an office in Chicago, Illinois, located at 353 North Clark Street, Suite 2200, Chicago, Illinois 60654 (the "Chicago Office").

9.     Weitlauf is a natural person who, upon information and belief, resides and may be served with process at 360 East South Water Street, Apartment 4403, Chicago, Illinois 60601.

10.     Beacon Hill is a limited liability company organized under the laws of the State of Massachusetts. Its headquarters and principal place of business are located at 152 Bowdoin Street, Boston, Massachusetts 02108. None of Beacon Hill's members are residents of either the State of Delaware or the State of Georgia. Beacon Hill maintains four offices in the greater Chicago metropolitan area:  200 W. Madison Street, Suite 1100, Chicago, Illinois 60606; 181 West Madison, 37th Floor, Suite C, Chicago, Illinois 60602; 10 N. Martingale Road, Schaumburg, Illinois 60173; and Two Mid-America Plaza, Suite 910, Oakbrook Terrace, Illinois 60181. Beacon Hill may be served with process by serving its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

## JURISDICTION AND VENUE

11.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Insight Global asserts federal claims under the DTSA. The Court also has supplemental or pendant jurisdiction over Insight Global's remaining claims against Defendants, pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal question claims. In addition, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Insight Global and its members are citizens of states other than the states

in which Weitlauf, Beacon Hill, and each of its members are citizens and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Weitlauf because he is a citizen of Illinois and resides in this District.

13. This Court has personal jurisdiction over Beacon Hill pursuant to the Illinois Long-Arm Jurisdiction Statute, 735 ILCS 5/2-209, under principles of specific and general jurisdiction as Beacon Hill conducts significant business in the State of Illinois, operates four offices in this State, and has sufficient minimum contacts with the State of Illinois such that exercise of jurisdiction over Beacon Hill does not offend traditional notions of fair play and substantial justice.

14. Venue in the Northern District of Illinois is appropriate under 28 U.S.C. § 1391, as a substantial part of the actions giving rise to the claims herein occurred in this District.

## FACTS GIVING RISE TO THE ACTION

**A. Insight Global Conducts Business in a Highly-Competitive Industry, Relying On Its Confidential Information and Trade Secrets, Which it Takes Reasonable Steps to Protect.**

15. Plaintiff Insight Global is a staffing services company with a focus in the information technology ("IT"), accounting, finance and engineering ("AF&E") sectors. Insight Global provides its clients with both short- and long-term staffing in a broad range of IT and AF&E positions, and also provides direct placement services for permanent positions. Insight Global regularly provides staffing services to clients throughout the country, including in the Chicago metropolitan area.

16. The staffing industry is highly competitive, with thousands of companies competing for a finite number of clients. Insight Global competes for both talent and clients with many other companies providing similar services in the marketplace. Insight Global

distinguishes itself through its investment in client relationships and training of its personnel, giving it a competitive advantage over the competition. Of significance, in such a competitive market, Insight Global distinguishes itself in part through its deep relationships with its clients and talent and an understanding of its customers and their needs. These relationships and knowledge are derived only after investment of substantial time and monetary resources of hundreds of thousands of dollars.

17.     Insight Global's business model is based upon providing extensive and specialized training and experience for its employees. Insight Global typically hires employees with no prior experience in or knowledge of the staffing industry and provides them with a variety of confidential business and financial information to train them effectively in order to allow them to follow and employ Insight Global's successful sales, marketing, and recruiting methods and strategies. Insight Global devotes substantial amounts of time and expense to recruiting and training its employees to prepare them to advance in Insight Global and to succeed in building relationships with Insight Global's clients.

18.     Insight Global's Chicago Office is an open environment, meaning the office's sales manager, account managers, and recruiters work together in a single open room referred to as the sales floor, or the "pit." To encourage open communication and exchange of information about sales leads, each account manager displays on a white board a list of leading sales prospects and staffing opportunities (referred to as "requisitions"). On any given day, requisitions posted usually include some staffing opportunities which are open to multiple staffing agencies, and some staffing opportunities to be filled exclusively by Insight Global. The requisitions are then displayed in the pit, and the entire sales team, including the sales manager, account managers, and recruiters, meet regularly to discuss the sales prospects, goals, and strategies of each team member for that day. These meetings are referred to as Priority Zone, or

"P-Zone."  While this information is made available to authorized Insight Global employees, it is treated as highly confidential information and is not made available to persons outside Insight Global.

19.     Insight Global maintains certain other confidential records and reports regarding its business relationships with customers and vendors, many of which qualify as trade secrets. Insight Global's employees create and update "client sheets" for each customer.  Together, client sheets comprise an account book.  Account books contain confidential information concerning Insight Global's actual and prospective customers, including detailed information regarding the customer's IT systems, short- and long-term staffing needs, staffing preferences, and chain of command for hiring decisions.   The account book also contains contact information for customers' and clients' hiring managers and vendor managers and other personal information relating to such hiring managers.

20.     The information collected is only learned after significant efforts by Insight Global employees to develop relationships with such personnel.  The information contained in the account books is a central part of Insight Global's successful sales strategy to build lasting personal and professional relationships with its customers.  Account books are maintained online through Insight Global's proprietary IT system, with tiered user access to ensure that the information contained in the account books is available only to appropriate personnel – *i.e.*, current employees of Insight Global with a need to access such information.

21.     Insight Global employees maintain and update confidential spreadsheets called "call sheets" daily.  Call sheets contain sales leads and contact information.  Insight Global employees use these call sheets to generate their daily sales calls. Each workday, call sheets are saved to the Insight Global network, the underlying information provided to their manager, and a

paper copy filed in each employee's workspace. No persons outside Insight Global receive copies.

22.     Additionally, every employee in each office prepares and submits a weekly sales report, which is electronically circulated to employees in that office. These reports contain valuable recruiting and sales information, including details of key requisitions, client preferences, out of office client opportunities, and pricing and billing schemes.

23.     Because of Insight Global's collaborative environment, its employees are exposed to, and develop an intimate understanding of, Insight Global's business. Employees know Insight Global's key existing customer relationships associated with their office, its sales strategy for developing and maintaining these business relationships, and the identities of the hiring managers and vendor managers who are Insight Global's primary customer contacts in their office. Sharing this information on a confidential basis among the sales manager, account managers, and recruiters who work together in each office is essential to Insight Global's business model.

24.     Insight Global's success as a business is also substantially based upon its strong customer relationships and goodwill. These relationships and goodwill have been developed through Insight Global's substantial investment in identifying and cultivating personal relationships with the human resources and management personnel (collectively "hiring managers") of Insight Global's customers, as well as the vendor managers hired by customers to screen and determine which vendors, such as Insight Global, may provide staffing services to the customers. Insight Global's compilations of information about its customer accounts and vendor managers are highly valuable documents that Insight Global intentionally preserves as confidential.

25. Insight Global must identify prospective customers that have staffing needs. Beyond identifying Insight Global by name, Insight Global must, more importantly, identify the hiring manager(s) who has the authority to make the actual staffing decisions. This is a challenging process, as companies are organized differently, and the title of an employee does not necessarily identify whether that person has hiring authority. Insight Global and its competitors cannot merely consult a trade periodical or some other public document or source for a list of names and contact information for the hiring managers of prospective customers. Instead, Insight Global spends months, if not longer, methodically working through its process to determine who at a prospective customer it should be contacting to sell its staffing services. In this process, Insight Global collects, analyzes, catalogues, and utilizes certain confidential client information to give Insight Global a competitive advantage in soliciting business from these hiring managers. Because this information is confidential and highly-valued, Insight Global secures this information on its protected network and its access-controlled offices.

26. Insight Global must cultivate a relationship with the prospective customer hiring manager both to understand the customer's staffing needs and to develop trust. This requires sustained contact with the customer and engagement. Insight Global will spend hundreds of thousands of dollars and hundreds of hours of personnel time developing these relationships and earning customer goodwill.

27. Insight Global has a legitimate business interest in protecting its (i) trade secrets; (ii) other valuable confidential business and financial information; (iii) relationships with its customers and clients; (iv) goodwill in the IT and AF&E industries at large and in the Chicago area in particular; and (v) its investment in the specialized training of its employees.

**B. Weitlauf's Employment with Insight Global.**

28.     Weitlauf began his employment with Insight Global on or about May 2, 2016, and worked for Insight Global through October 10, 2017.  During this time, Weitlauf operated out of Insight Global's Chicago office.  Prior to his employment with Insight Global, Weitlauf had little to no experience in the staffing industry.  Insight Global provided Weitlauf with substantial and specialized training regarding its business model and sales and recruiting methods and strategies, as well as access to trade secrets belonging to Insight Global.

29.     Upon starting to work for Insight Global, Weitlauf was employed as a Recruiter in Training.  In that role, Insight Global provided Weitlauf with specialized one-on-one and group training to prepare him for a career with Insight Global with a focus on IT staffing.  During this time, at various formal and informal trainings, Weitlauf was exposed to trade secrets regarding the nature and structure of Insight Global's business, its recruiting and placement strategies, and its valuable training methodologies.

30.     On or around June 27, 2016, Weitlauf was promoted to the position of Recruiter. As a Recruiter, Weitlauf continued to receive specialized training and exposure to Insight Global's trade secrets and other confidential business information, with his primary responsibility being to converse with Account Managers regarding client staffing needs in the IT and AF&E industries, and ultimately to identify and recommend the best qualified professionals to meet those needs.  Additionally, because most Recruiters are ultimately on the path to sales, Weitlauf was encouraged and trained to develop relationships with Insight Global's Account Managers, client hiring and vendor managers, and other professionals, to develop and perpetuate goodwill on behalf of Insight Global.  Weitlauf regularly accompanied Account Managers on outings to meet with Insight Global's clients.  He also maintained a list of professionals

("contractors" or "consultants") that he used to staff client openings, which list is commonly referred to as a "hotbook."

31.     On or around August 19, 2016, Weitlauf was promoted to the position of Account Manager.  Account Managers are responsible for creating business partnerships between Insight Global and its customers in their given territory.  In his position as Account Manager, and through his relationships with Insight Global's clients, Weitlauf was entrusted with significant trade secrets belonging to Insight Global, including but not limited to actual and potential customer information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates.

32.     On February 6, 2017, Weitlauf was transitioned to the role of Professional Recruiter ("Pro Recruiter").  As a Pro Recruiter, Weitlauf was in regular communication with Insight Global's customers and clients.  His responsibilities included communicating with client hiring managers and vendor managers about their staffing needs, identifying and recommending the most qualified candidates, accompanying candidates to their interviews with human resources and management personnel at Insight Global's customers' offices, accompanying new placements on the first day of employment in their new positions, and then regularly interfacing between the customer and the consultants to ensure a mutually satisfactory work experience.  He also often accompanied Insight Global's account managers on lunches and other client outings. As a result, Weitlauf further developed significant contacts with Insight Global's key clients.

33.     During the period Weitlauf was employed with Insight Global, he traveled to Atlanta, Georgia on multiple occasions to participate in special training at the Insight Global headquarters, including a three-day Recruiter training and a four-day Account Manager training, as well as sales conferences in Atlanta and Orlando.  During these trainings and conferences, Weitlauf was exposed to a substantial number of Insight Global trade secrets regarding its

business methods and strategies, sales techniques, and other confidential business and/or financial information.

34.     While Weitlauf was employed with Insight Global he had extensive access to valuable trade secrets belonging to Insight Global and other confidential and proprietary business information about Insight Global's business.  He regularly viewed and discussed requisitions in the P-Zone, accessed client account books, received weekly sales and recruiting reports from employees in the Chicago Office, and attended meetings and special trainings where Insight Global's confidential and proprietary business information was discussed.  By virtue of being employed and extensively trained in a variety of roles at Insight Global, Weitlauf was given wide-ranging access to Insight Global's trade secrets, including but not limited to:

> (a) Information about Insight Global's customer and client relationships including customers' staffing placement history, current and long-term needs and preferences, and pricing;

> (b) Identities and personal contact information for hiring managers and vendor managers who are Insight Global's primary customer contacts, and who are difficult to identify from publicly-available information;

> (c) Proprietary information relating to pricing for various contractor skill sets, margins, and thresholds for profitability; and

> (d) Proprietary bidding procedures, recruiting methods and sales strategies for negotiating and winning business with contractors and clients.

35.     During his employment with Insight Global, Weitlauf had regular access to Insight Global's trade secrets, including proprietary information associated with client relationships developed, maintained, and protected by Insight Global, as well as other confidential and proprietary business information of great competitive value in the IT and AF&E

industries, *e.g.*, the staffing placement history, current needs, preferences, and pricing for Insight Global's customers; the identities and personal contact information for the hiring managers and vendor managers who are Insight Global's primary customer contacts and difficult to identify from publicly available information; and other information relating to pricing for various contractor skill sets, margins and thresholds for profitability, and negotiation strategies to win and obtain business with contractors and clients.

36.     As a result of Insight Global's investment in training and developing Weitlauf's skill set, he built important relationships and goodwill with Insight Global's customers and clients, consultants, and vendors through regular meetings, telephone calls, and other contact. Weitlauf was also entrusted with extensive customer contact during the placement process for new candidates.

### C. Insight Global's Legitimate Business Interests.

37.     Insight Global takes reasonable measures to protect its trade secrets and other legitimate business interests.  Insight Global employees are instructed to treat as confidential the training they receive in Insight Global's proprietary sales and marketing methods and strategies, as well as any information shared with them concerning Insight Global's customers. Additionally, Insight Global understands the irreparable injury that could be done by the disclosure of its confidential and proprietary business information and strategies by current and former employees, and seeks to protect its substantial investment in developing strong customer relationships and goodwill.   Accordingly, contractual provisions designed to protect these interests are included in Insight Global's employment and separation agreements with its employees.  Specifically, employees' agreements contain provisions requiring non-disclosure, non-competition, non-solicitation, and return of Insight Global's property and information at the conclusion of their employment.

-13-

38.     Insight Global also maintains access-controlled offices, where visitors are restricted and limited with respect to their ability to view physical documents and electronic information.

39.     Insight Global also stores its data on secure servers with restricted access.  In signing onto the system, Insight Global employees acknowledge that they are only accessing information for legitimate business purposes.  Furthermore, confidential information stored on the system is additionally restricted to the Insight Global personnel who have legitimate needs to access the information.  In other words, even Insight Global employees do not have unfettered access to its confidential information and trade secrets.

40.     Insight Global devotes substantial amounts of time and expense in training its employees, who generally do not have prior staffing experience, to prepare them to advance and succeed in building relationships with Insight Global's customers and clients.  Insight Global employees all over the country are regularly flown to Insight Global's corporate headquarters in Atlanta, Georgia to attend trainings at Insight Global's Professional Development Center (the "PDC").  Weitlauf attended training sessions at the PDC and received weekly, if not daily, invaluable training by way of formal and informal mentoring during his employment with Insight Global.

**D.  Weitlauf's Employment Agreement.**

41.     Because of Weitlauf's access to Insight Global's trade secrets and confidential information, Weitlauf entered into multiple At-Will Employment Agreements with Insight Global.  Each agreement contained restrictive covenants.

42.     On April 26, 2016, as a condition of his employment with Insight Global, Weitlauf and Insight Global voluntarily entered into an At-Will Employment Agreement.  On August 19, 2016, Weitlauf and Insight Global voluntarily entered into another At-Will

Employment Agreement (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

43.     The Employment Agreement contains several restrictions on Weitlauf's conduct during and after his employment with Insight Global.

44.     The Employment Agreement contains an express provision for the protection of Insight Global's trade secrets, in which Insight Global agreed to provide the employee with Trade Secrets, as defined in the agreement, and the employee agreed not to use or disclose any trade secret at any time during or after employment without Insight Global's prior written consent (the "Trade Secret Provision").

45.     Insight Global's customer information, including but not limited to information contained in client account books, weekly sales and recruiter reports, daily requisition postings and training materials constitutes protected Trade Secrets as defined in the Employment Agreement.  Such information has been compiled and created over many years at substantial effort and expense and is not publicly available, and Insight Global takes reasonable steps to protect its secrecy as described herein.  The industries in which Insight Global operates are highly competitive.

46.     Under the Employment Agreement, Weitlauf also agreed to protect Insight Global's confidential business information and not disclose the Confidential Information, as defined in the Employment Agreement (the "Non-Disclosure Provision").

47.     Under the Employment Agreement, Weitlauf further agreed not to perform similar staffing services in competition with Insight Global within a pre-determined radius of the Insight Global office in which he worked for a period of one year following the termination of employment (the "Non-Competition Provision").

48.     Weitlauf also agreed that he would not solicit actual or prospective Insight Global clients, with whom he had material contact during the last two years of employment, for a period of one year following the termination of employment (the "Non-Solicitation Provision").

49.     Weitlauf further agreed to return all of Insight Global's property, information and other materials upon termination of his employment (the "Return of Materials Provision").

50.     Weitlauf also agreed to provide any future employer with a copy of the Employment Agreement and notify Insight Global of such employment during the Restricted Period, as defined in the Employment Agreement (the "Notification Provision").

51.     In addition to the promises above, Weitlauf stipulated and agreed in the Employment Agreement that any breach of the restrictive covenants above would cause Insight Global irreparable injury and that the restrictions contained therein were reasonable.

52.     Moreover, if Weitlauf breached the Non-Competition or Non-Solicitation Provision, Weitlauf agreed that the duration of the restrictions contained in those Provisions would be tolled during that period of breach (the "Tolling Provisions").

53.     Additionally, in the Employment Agreement, Insight Global and Weitlauf agreed that Insight Global would be entitled to attorneys' fees and costs if it prevailed in litigation seeking to enforce the provisions contained in the Employment Agreement (the "Attorneys' Fees Provision").

54.     Lastly, the Employment Agreement contains a choice of law provision, to which Weitlauf agreed would apply to the agreement without regard to conflicts of laws provisions.

**E.  Misappropriation of Insight Global's Trade Secrets.**

55.     After Weitlauf's employment with Insight Global terminated, Insight Global learned from sources other than Weitlauf that Weitlauf had, in fact, accepted employment with Beacon Hill in a similar capacity and within the same region where he worked for Insight

Global. As a result of this information, Insight Global investigated Weitlauf's conduct and activity in the time leading up to his resignation to understand the scope of his unlawful actions and the extent to which these actions damaged Insight Global and could continue to do so.

56. Knowing his employment with Insight Global was drawing to a close, upon information and belief, Weitlauf began to collect and misappropriate Insight Global's trade secrets and confidential information before he resigned.

57. The information misappropriated by Weitlauf included, but was not limited to: (i) details regarding Insight Global clients, including contact details for hiring managers with these clients; (ii) information regarding active and former contractors which Insight Global had placed with its clients, including all relevant contact information for these contractors and their respective rates; and (iii) leads for prospective contractors and customers with whom Insight Global intended to conduct business. These documents and other information misappropriated by Weitlauf contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

**F. Weitlauf's Direct Competition with Insight Global.**

58. Weitlauf is currently employed by Beacon Hill in Chicago. In his capacity as a Beacon Hill employee, Weitlauf is, among other things, recruiting for various positions, including communicating and regularly interfacing with hiring and vendor managers at companies in and around the Chicago area about their staffing needs, identifying and recommending qualified candidates, and placing and communicating with contractors. Upon information and belief, in furtherance of these objectives, Weitlauf has utilized the trade secret information that he misappropriated from Insight Global to more effectively, and unlawfully, target Insight Global customers on behalf of Beacon Hill.

59.     Weitlauf also did not notify Insight Global of his employment with Beacon Hill at least fourteen (14) days prior to the commencement of his employment with Beacon Hill, and at no time has Weitlauf provided Insight Global with a sworn affidavit stating that his employment with Beacon Hill shall not violate the terms of the Employment Agreement, and that he has provided a copy of his Employment Agreement to Beacon Hill.

60.     Further, Weitlauf's unlawful competition through the actual and threatened use of Insight Global's trade secrets, in breach of his Employment Agreement, stands to cause significant harm to Insight Global due to Weitlauf's substantial knowledge of Insight Global's customers and clients, including several key accounts, and his training in Insight Global's trade secret sales methods and strategies.

61.     Additionally, it is impossible for Weitlauf to perform his job duties for Beacon Hill without using or disclosing Insight Global's trade secrets in violation of the Non-Disclosure Provision and Illinois law.  Even if Beacon Hill were to instruct Weitlauf not to use or disclose such trade secret and confidential information, it is impossible for Weitlauf to perform his job functions without relying on his knowledge of Insight Global's trade secrets, including information regarding current and prospective clients, including identity, contact information, and preferences of hiring and vendor managers, and sales, marketing, and recruiting strategies and techniques.  The use and disclosure of Insight Global's trade secrets is inevitable in his employment capacity for Beacon Hill.

62.     As a result of Weitlauf's misappropriation of Insight Global's trade secrets, Insight Global has and will continue to suffer irreparable harm in the form of loss of goodwill, actual loss of customers, exposure of its trade secrets and resulting loss of competitive advantage, among other things.

63.     As a direct consequence of Weitlauf's wrongful conduct, Insight Global has incurred substantial expense to enforce the Employment Agreement.

**G. Beacon Hill's Knowledge of the Employment Agreement, and other Wrongful and Tortious Actions.**

64.     Competing unfairly for employees – including by inducing employees to breach their contracts with competitors – is one of Beacon Hill's business strategies.  This is illustrated by the fact that Beacon Hill has been sued over thirty times over the last eleven years in similar cases by many competitors in the staffing industry.  Beacon Hill's long history of engaging in unfair competition has also led to multiple prior lawsuits with Insight Global.[1]

65.     As a result of their litigation track record, and the discovery exchanged in those cases, Beacon Hill is well aware that Insight Global enters into At-Will Employment Agreements with all of its employees that contain certain restrictive covenants.  Specifically, and prior to their employment of Weitlauf, Beacon Hill had active knowledge that these agreements include, among other things, the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions.

66.     Additionally, Beacon Hill has conducted and continues to conduct an unlawful employee-raiding campaign of Insight Global's then-current and former employees.  The California Action, the Colorado Action, and the New York Action are not the only examples of Beacon Hill's illegal and unfair competitive strategy.  For example, Beacon Hill has hired

---

[1] Moreover, Insight Global and Beacon Hill are currently litigating three cases – other than the one at bar – tied to Beacon Hill's unfair competition and tortious interference with Insight Global's contractual relations with its then-current and former employees.  *See Insight Global, LLC v. Beacon Hill Staffing Group LLC*, N.D. Cal., 3:17-cv-00309-BLF (HRL) (the "California Action"); *Insight Global, LLC v. Mary McDonald and Beacon Hill Staffing Group, LLC*, D. Colo., 1:17-cv-01915-MSK-MJW (the "Colorado Action"), and *Insight Global, LLC v. Daniel Wenzel, Luke Norman, Lauren Sutmar and Beacon Hill Staffing Group, LLC*, S.D.N.Y., 1:17-cv-08323 (the "New York Action").

approximately ten Insight Global employees in 2017 – and that number only includes the individuals that Insight Global knows about. As it is Beacon Hill's *modus operandi* to conceal its hires of former Insight Global employees from Insight Global (by, for example, instructing the employees not to update their LinkedIn profiles to disclose their employment with Beacon Hill), the actual number is likely higher – possibly by a significant margin.

67.    Pursuant to the Employment Agreement, Weitlauf is bound by a valid and enforceable agreement that, among other things: (i) bars him from soliciting Insight Global's customers or clients about whom he obtained confidential business information or trade secrets during the last twenty-four months of his employment with Insight Global; (ii) prevent Weitlauf from soliciting other Insight Global employees to terminate their employment with Insight Global; (iii) prohibit Weitlauf from using, disclosing, or exploiting Insight Global's confidential business information; and (iv) requires Weitlauf to return all information and materials to Insight Global immediately upon the termination of his employment. Beacon Hill is aware that Weitlauf is bound by these contractual obligations.

68.    Upon information and belief, Beacon Hill has instructed Weitlauf that he does not need to comply with his contractual obligations to Insight Global, and has promised to provide Weitlauf with a legal defense and indemnify Weitlauf for any adverse judgment he may incur as a result of litigation with Insight Global.

69.    Insight Global has not authorized Weitlauf to possess, use, disclose, or exploit its confidential business information during his Beacon Hill employment or at any other time.

70.    Upon information and belief, Weitlauf has used and is using Insight Global's confidential business information to conduct business for Beacon Hill and to solicit Insight Global's current and prospective clients, to do business with Beacon Hill in violation of the

Employment Agreement. Insight Global is informed and believes and thereon alleges that Beacon Hill has and had knowledge of, and approved, these unlawful actions.

71. Further, Weitlauf has taken steps to keep his illicit activities hidden from disclosure. Insight Global is informed and believes and thereon alleges that Weitlauf has done these things in concert with Beacon Hill to cover up the illicit nature of his and Beacon Hill's activities.

72. In knowing of the restrictive covenants in Weitlauf's Employment Agreement, hiring Weitlauf, encouraging Weitlauf to solicit Insight Global's current and prospective clients using Insight Global's confidential and trade secret information, and assisting Weitlauf in covering up his illicit actions, Beacon Hill has engaged and is engaging in unfair competition that is contrary to his contractual obligations and the law.

## **COUNT I**

### **Injunction for Misappropriation of Trade Secrets**
### **Under the DTSA – 18 U.S.C. § 1832 (Against Weitlauf)**

73. Insight Global adopts and realleges the allegations contained in paragraphs 1-72 above as if fully set forth herein.

74. Insight Global operates its business in interstate commerce across the United States.

75. As set forth above and upon information and belief, Weitlauf improperly retained Insight Global's trade secret and confidential information after his employment relationship with Insight Global ended. The trade secrets misappropriated by Weitlauf included information concerning Insight Global's methodologies and market research, information regarding Insight Global's contractors, as well as client-related information, in violation of the Employment Agreement. This and other information Insight Global believes Weitlauf misappropriated

contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to Insight Global's business that is secret and of value.

76. The above-documents qualify as "trade secrets" under the Defense of Trade Secrets Act ("DTSA"), as defined under 18 U.S.C. § 1839(3). Insight Global has its employees sign an agreement prohibiting use and disclosure of such trade secrets outside of Insight Global and demanding their return upon termination of employment. Such information required substantial resources, time and investment by Insight Global to create, collect and/or develop, and it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means. Weitlauf has used, is using, and inevitably will continue to use Insight Global's trade secrets on behalf of Beacon Hill unless enjoined.

77. Weitlauf's actions described herein constitute a willful and malicious misappropriation of Insight Global's trade secrets.

78. Weitlauf's misappropriation of Insight Global's trade secrets is causing, and threatens to continue causing, Insight Global to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its investment in its trade secrets. This harm cannot be adequately remedied at law and requires permanent injunctive relief.

79. Upon information and belief, Weitlauf has used Insight Global's trade secrets and confidential information to compete with Insight Global and is continuing to do so.

80. Insight Global is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3), restraining and enjoining Weitlauf, and all those in privity, concert or participation with Weitlauf, from engaging in such wrongful acts in violation of the DTSA.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A. Permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3), restraining and enjoining Weitlauf, and all those in privity, concert or participation with him, from engaging in acts and practices in violation of the DTSA;

B. An order compelling Weitlauf, and all those in privity, concert or participation with him, to return to Insight Global any and all trade secrets or confidential information, wherever and however stored, and all derivations and compilations and/or other memorializations of such purloined information; together with such other affirmative relief required to compel compliance with this order, including the use of electronic evidence experts and other technicians;

C. Attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D); and

D. Such additional relief as this Court deems equitable and just.

## COUNT II

### Damages for Misappropriation of Trade Secrets
### Under the DTSA – 18 U.S.C. § 1832 (Against Weitlauf)

81. Insight Global adopts and realleges the allegations contained in paragraphs 1-77 above as if fully set forth herein.

82. Weitlauf, through his actions in violations of the DTSA, has damaged Insight Global, and Insight Global will continue to sustain monetary damages as a result of Weitlauf's conduct.

83. Insight Global is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses.

84.     Because Weitlauf's DTSA violations have been willful and malicious, Insight Global is entitled to exemplary damages of no more than twice the amount of damages for any actual loss and any unjust enrichment.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A.  Judgment in favor of Insight Global, against Weitlauf, for compensatory damages in an amount to be proven at trial;

B.  Judgment in favor of Insight Global, against Weitlauf, for exemplary damages of no more than twice the amount of damages for any actual loss or any unjust enrichment pursuant to 18 U.S.C. § 1836(b)(3)(C);

C.  Attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D); and

D.  Such other relief as this Court deems equitable and just.

## COUNT III

**Injunction for Violation of the Illinois Trade Secrets Act (Against Weitlauf)**

85.     Insight Global adopts and alleges the allegations contained in paragraphs 1-80 above as if fully set forth herein.

86.     The documents and information described herein that were misappropriated by Weitlauf qualify as protected "trade secrets" under the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq*.

87.     As expressly acknowledged in the Employment Agreement, Insight Global considers these items to be confidential and proprietary trade secrets, and at all time relevant hereto, Insight Global has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information.

88.     Insight Global derives economic value and competitive advantage from such information not being generally known to the public or trade.

89.     Upon information and belief, Weitlauf improperly retained documents and information containing Insight Global's trade secrets in violation of the Employment Agreement and Illinois law, and is using Insight Global's trade secrets for his own benefit or the benefit of others.

90.     Upon information and belief, Weitlauf used, is using, and inevitably will continue to use Insight Global's trade secrets in violation of the Employment Agreement unless enjoined.

91.     Weitlauf's actions described herein constitute the willful misappropriation of Insight Global's trade secrets under Illinois law.

92.     Insight Global has sustained and will continue to sustain damages, which are difficult to approximate, as a direct result of Weitlauf's threatened and actual misappropriation of Insight Global's trade secrets.

93.     Weitlauf's misappropriation of Insight Global's trade secrets is causing, and threatens to continue causing, Insight Global to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its investment in its trade secrets.

94.     This harm cannot be adequately remedied at law and requires permanent injunctive relief.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A.  Permanent injunctive relief pursuant to 765 ILCS 1065/1, *et seq*., restraining and enjoining Weitlauf, and all those in privity, concert or participation with him, from engaging in acts and practices in violation of the Illinois Trade Secrets Act;

B. An order compelling Weitlauf to return to Insight Global any and all of Insight Global's trade secrets, wherever and however stored, and all derivations and compilations and/or other memorializations of such purloined information; together with such other affirmative relief required to compel compliance with this order, including the use of electronic evidence experts and other technicians;

C. Attorneys' fees and costs pursuant to 765 ILCS 1065/1, *et seq.*; and

D. Such additional relief as this Court deems equitable and just.

## COUNT IV

### Damages for Violation of the Illinois Trade Secrets Act (Against Weitlauf)

95.     Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 72 and 86 – 91 above as if fully set forth herein.

96.     Weitlauf, through his actions in violation of 765 ILCS 1065/1, *et seq.*, has caused Insight Global to incur monetary damages, and Insight Global will continue to sustain monetary damages as a result of Weitlauf's conduct in violation of the Illinois Trade Secrets Act.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A. Judgment in favor of Insight Global, against Weitlauf, for compensatory damages pursuant to 765 ILCS 1065/1, *et seq.*, in an amount to be proven at trial;

B. Attorneys' fees and costs pursuant to 765 ILCS 1065/1, *et seq.*; and

C. Such additional relief as this Court deems equitable and just.

## COUNT V

### Injunction for Breach of the Employment Agreement (Against Weitlauf)

97.     Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 72 above as if fully set forth herein.

98.     As a condition of his employment with Insight Global, and for valuable consideration, Weitlauf entered into the Employment Agreement, which contains several restrictive covenants, including the Non-Competition, Non-Solicitation, Non-Disclosure and Trade Secret Provisions, as well as a Return of Materials Provision. The specific terms of these covenants are set forth in Exhibit A.

99.     Insight Global performed its obligations under the Employment Agreement.

100.    Weitlauf has breached the Non-Disclosure, Trade Secret, Return of Materials, Notification Provisions, and, upon information and belief, the Non-Solicitation Provision by, among other things, (i) working for Beacon Hill in the Chicago area in the same or similar capacity in which he worked for Insight Global, (ii) upon information and belief, soliciting employees and clients or customers of Insight Global on behalf of Beacon Hill and (iii) using, disclosing, or retaining Insight Global's confidential business information, and by not notifying Insight Global of his acceptance of employment with Beacon Hill.

101.    As a result of Weitlauf's actions in violation of the Employment Agreement, Insight Global has suffered, and continues to suffer, substantial and irreparable injury.

102.    Weitlauf's continuing actions in violation of the Employment Agreement exposes Insight Global to a pending and ongoing threat of immediate and irreparable harm.

103.    Weitlauf agreed, in writing, that Insight Global would suffer irreparable harm as a result of any actions taken by them in violation of the Employment Agreement, and that remedies at law would be inadequate. Weitlauf further acknowledged and agreed that Insight Global would be entitled to immediate injunctive relief and other equitable remedies in the event of his breach of the Employment Agreement, and that the Restricted Period would be tolled for as long as he is and remains in breach of his obligations under the Employment Agreement.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A.  Permanent injunctive and other relief that would return the parties to their position *status quo ante*, disgorging all compensation Insight Global paid to Weitlauf during Weitlauf's course of conduct in breach of his contractual employment duties owed to Insight Global; and

B.  Such other relief as the Court deems equitable and just.

## COUNT VI

### Damages for Breach of the Employment Agreement (Against Weitlauf)

104.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 72 and 98 – 103 above as if fully set forth herein.

105.    As a result of Weitlauf's breach of his employment obligations under the Employment Agreement, Insight Global has suffered damages, including but not limited to, lost business, lost profits, and expenses in connection with its efforts prevent and minimize the effects of Weitlauf's misconduct.

106.    As provided by the Employment Agreement, Insight Global is entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred in bringing claims to enforce the terms and conditions of the Employment Agreement.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A.  Judgment in favor of Insight Global, against Weitlauf, for compensatory damages in an amount to be proven at trial;

B.  Attorneys' fees and costs pursuant to the Employment Agreement; and

C.  Such additional relief as this Court deems equitable and just.

<u>**COUNT VII**</u>

**Injunction for Breach of the Duty of Loyalty (Against Weitlauf)**

107. Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 72 above as if fully set forth herein.

108. Weitlauf breached his duty of loyalty to Insight Global by, among other things, misappropriating Insight Global's confidential, proprietary and/or trade secret information while he was still employed by Insight Global for the purpose of using the information to compete with Insight Global in his new role at Beacon Hill.

109. As a result of Weitlauf's breach, Insight Global has suffered and will continue to suffer irreparable harm if Weitlauf's actions are not enjoined. There is no adequate remedy at law for the injuries sustained by Insight Global.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A. Permanent injunctive and other relief that would return the parties to their position *status quo ante*, disgorging all compensation Insight Global paid to Weitlauf received during Weitlauf's course of conduct in breach of his duty of loyalty owed to Insight Global; and

B. Such additional relief as this Court deems equitable and just.

<u>**COUNT VIII**</u>

**Damages for Breach of the Duty of Loyalty (Against Weitlauf)**

110. Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 108 above as if fully set forth herein.

111.     As a result of Weitlauf's breach of his duty of loyalty owed to Insight Global as set forth herein, Insight Global has suffered monetary damages, including but not limited to, lost business, lost profits, and expenses.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Weitlauf:

A.   Judgment in favor of Insight Global and against Weitlauf for compensatory damages in an amount to be proven at trial; and

B.   Such additional relief as this Court deems equitable and just.

## COUNT IX

**Injunction for Tortious Interference with Contract (Against Beacon Hill)**

112.     Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 111 above as if fully set forth herein.

113.     As described above, Insight Global entered into binding Employment Agreement with Weitlauf which contained certain restrictive covenants, including the Non-Competition clause, the Non-Solicitation covenant, and the Non-Disclosure and Trade Secret Provisions.

114.     Beacon Hill knew that Insight Global and Weitlauf had a contractual relationship via the Employment Agreement, as well as the terms of the restrictive covenants contained therein.

115.     Despite having this knowledge, Beacon Hill knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which intended and did induce Weitlauf to breach, among other things, the Non-Disclosure, Non-Competition and Trade Secret Provisions of the Employment Agreement.

116.    The improper conduct of Beacon Hill was committed with actual malice and ill will toward Insight Global, and with the intentional and improper purpose of causing irreparable damage.

117.    Insight Global has suffered, and will continue to suffer, irreparable harm if Beacon Hill's actions are not enjoined.  There is no adequate remedy at law for Insight Global's injuries.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Beacon Hill:

A.   Permanent injunctive and other relief that would return the parties to their position *status quo ante*; and

B.   Such additional relief as this Court deems equitable and just.

## COUNT X

### Damages for Tortious Interference with Contract (Against Beacon Hill)

118.    Insight Global adopts and realleges the allegations contained in Paragraphs 1 – 117 above as if fully set forth herein.

119.    As a result of Beacon Hill's tortious interference with Insight Global's Employment Agreement with Weitlauf, Insight Global has suffered damages.

**WHEREFORE**, Insight Global respectfully requests that this Court enter the following relief against Beacon Hill:

A.  Judgment in favor of Insight Global, and against Beacon Hill, for compensatory damages in an amount to be proven at trial;

B.  Such additional relief as this Court deems equitable and just.

Dated: November 13, 2017            Respectfully submitted,

**INSIGHT GLOBAL, LLC**

By:    /s/ John M. Riccione             
            One of its attorneys

John M. Riccione
jriccione@taftlaw.com
Brianna M. Skelly
bskelly@taftlaw.com
TAFT, STETTINIUS & HOLLISTER LLP
Attorneys for the Plaintiff
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

21603997.3